# 24-390-cr

To be argued by:
**YUANCHUNG LEE**

_____
_____

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 24-390-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

JAMIL HAKIME,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF FOR DEFENDANT-APPELLANT JAMIL HAKIME**

_____

FEDERAL DEFENDERS OF NEW YORK, INC.
APPEALS BUREAU
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

Attorney for Defendant-Appellant
**JAMIL HAKIME**

**YUANCHUNG LEE,**
Of Counsel

_____
_____

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . 1

QUESTION PRESENTED. . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . 4

    1.   Offense conduct . . . . . . . . . . . . . . . . . 4

        A.   Brown, Mahrer, and Hakime. . . . . . . . . . 4

        B.   Two phone calls during the trip to
           Pennsylvania . . . . . . . . . . . . . . . . 5

           1.   Detective Schneider's call to Brown . . . . 5

           2.   The call with inmate Wright . . . . . . . . 6

        C.   The sale in Pennsylvania . . . . . . . . . . 6

        D.   State authorities arrest Brown and Mahrer. . . . 7

        E.   Hakime's federal arrest two weeks later. . . . . 7

    2.   Complaint and indictment. . . . . . . . . . . . . 8

    3.   The detention hearing . . . . . . . . . . . . . . 9

    4.   Plea agreement . . . . . . . . . . . . . . . . . 9

        A.   The stipulated Guidelines calculation. . . . . 10

        B.   The parties agree not to "seek" or "in any
           way suggest" a Guideline enhancement . . . . . 10

    5.   Hakime pleads guilty. . . . . . . . . . . . . . . 11

    6.   The PSR . . . . . . . . . . . . . . . . . . . . . 12

        A.   The Guidelines range is 10 to 16 months. . . . 12

B.   "The Government provided no information that HAKIME was aware of the plot against synagogues." . . . . . . . . . . . . . . . . . 12

7.   The Government claims that Hakime knew of the buyers' plan and should be sentenced to the statutory maximum. . . . . . . . . . . . . . . . . . 13

8.   Hakime denies the Government's allegation and asserts that it breached the plea agreement. . . . . 15

A.   The Government repeatedly asserts to the sentencing court that Hakime knew or should have known that the buyers intended to use the gun to commit mass murder. . . . . . . . . 15

B.   Hakime denies knowledge and argues that the Government breached the plea agreement. . . . . 16

9.   The court conducts an evidentiary hearing, rejects the Government's argument, and imposes an above-range sentence. . . . . . . . . . . . . . . 18

A.   The court rejects the Government's argument. . 19

B.   The Government seeks the statutory maximum . . 19

C.   The defense requests a within-range sentence . 20

D.   The court upwardly varies and imposes a 27-month sentence. . . . . . . . . . . . . . . 20

E.   Counsel preserves the defense's claim of breach . . . . . . . . . . . . . . . . . . . . 21

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 23

The Government breached the plea agreement by arguing at sentencing that Hakime knew or should have known of the buyers' murderous intent when he sold the gun to them . . . . 23

A.   "[P]rosecutors engaged in plea bargaining" are held to "the most meticulous standards of both promise and performance" and must "comport[] with the highest standards of fairness." . . . . . . . . . . 24

ii

B. A breach occurs when the Government's conduct at sentencing "raises doubts [about] whether defendant could reasonably" have expected it when entering the agreement . . . . . . . . . . . 26

C. Formal compliance does not insulate a breach when the "net effect" of the Government's "overall conduct" undermines the benefit of the bargain upon which the defendant relied in pleading guilty. . . . . . . . . . . . . . . . . 26

D. The Government breached the plea agreement by asking the district court to find by a preponderance of the evidence that Hakime knew or should have known of the buyers' murderous intent. . . . . . . . . . . . . . . . . 28

E. The court should enforce the bargain by remanding the case for resentencing before a different judge . . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . 34

**TABLE OF AUTHORITIES**

**CASES**                                                    **PAGE(S)**

Gammarano v. United States,
  732 F.2d 273 (2d Cir. 1984) . . . . . . . . . . . . . . . 27

Santobello v. New York,
  404 U.S. 257 (1971) . . . . . . . . . . . . . . . . . . . 33

United States v. Amico,
  416 F.3d 163 (2d Cir. 2005) . . . . . . . . 27, 29, 30, 31, 32

United States v. Brody,
  808 F.2d 944 (2d Cir. 1986) . . . . . . . . . . . . . . . 25

United States v. Cortes-Lopez,
  __ F.3d ___, 2024 WL 2104676 (1st Cir. 2024) 27, 28, 31, 32, 33

United States v. Frazier,
  340 F.3d 5 (1st Cir. 2003). . . . . . . . . . . . . . . . 28

United States v. Granik,
  386 F.3d 404 (2d Cir. 2004) . . . . . . . . . . . . . . . 24

United States v. Griffin,
  510 F.3d 354 (2d Cir. 2007) . . . . . . . . . . . . . 24, 25

United States v. Habbas,
  527 F.3d 266 (2d Cir. 2008) . . . . . . . . . . . . . . . 26

United States v. Lawlor,
  168 F.3d 633 (2d Cir. 1999) . . . . . . . . . . . . . 21, 25

United States v. Leach,
  182 F.3d 901, 1999 WL 491855 (2d Cir. 1999) . . . . . . . . 28

United States v. Lessard,
  35 F.4th 37 (1st Cir. 2022) . . . . . . . . . . . . . . . 27

United States v. Mammedov,
  304 F. App'x 922 (2d Cir. 2008) . . . . . . . . . . . . . 24

United States v. Palladino,
  347 F.3d 29 (2d Cir. 2003). . . . . . . . . . . . . . 26, 30

United States v. Paradiso,
  689 F.2d 28 (2d Cir. 1982). . . . . . . . . . . . . . . . 26

United States v. Reira,
  298 F.3d 128 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 25

United States v. Vaval,
  404 F.3d 144 (2d Cir. 2005) . . . . . . . . . . . . . . passim

United States v. Wilson,
  920 F.3d 155 (2d Cir. 2019) . . . . . . . . . . . . . . 26, 27

**STATUTES**

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . 2, 9, 11

18 U.S.C. § 922(a)(3) . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 922(g)(1) . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742(a) . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . 1

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 2K2.1(a)(6). . . . . . . . . . . . . . . . . . 2, 10

U.S.S.G. § 2K2.1(b)(6)(B) . . . . . . . . . . . . . . . passim

U.S.S.G. § 3553(a). . . . . . . . . . . . . . 10, 18, 20, 31

U.S.S.G. § 3E1.1(a) . . . . . . . . . . . . . . . . . . . . 10

**OTHER AUTHORITIES**

Two Men Arrested in Threat to New York's Jewish Community
Are Charged, New York Times, Nov. 20, 2022, available at
https://www.nytimes.com/2022/11/20/nyregion/new-york-jewish-
synagogue-threat.html . . . . . . . . . . . . . . . . . . . 7

United States Sentencing Commission, What Do Federal
Firearms Offenses Really Look Like? (July 2022) . . . . . . . 29

_____
_____

**United States Court of Appeals
for the Second Circuit**

_____

Docket No. 24-390

_____

UNITED STATES OF AMERICA,

Appellee,

-against-

JAMIL HAKIME,

Defendant-Appellant.

_____

APPEAL FROM A FINAL JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____

**BRIEF FOR DEFENDANT-APPELLANT JAMIL HAKIME**
_____

**STATEMENT OF JURISDICTION**

This is an appeal from a final judgment of conviction imposed on February 6, 2024, in the United States District Court for the Southern District of New York (Analisa Torres, J.). Hakime filed a notice of appeal on February 12, 2024. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). The district court had jurisdiction pursuant to 18 U.S.C. § 3231.

## QUESTION PRESENTED

Did the Government breach its plea agreement with Jamil Hakime by arguing at sentencing that he knew or should have known that the men to whom he sold a gun intended to use it to commit mass violence, where (a) the agreement barred the Government from "in any way suggest[ing]" at sentencing "any [] adjustment pursuant to the Guidelines that is not set forth herein"; and (b) Section 2K2.1(b)(6)(B) of the Guidelines -- an adjustment "not set forth" in the agreement -- requires a four-level enhancement if a defendant "transferred any firearm [] with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony."

## STATEMENT OF THE CASE

Pursuant to a plea agreement with the Government, Jamil Hakime pleaded guilty to conspiring to transport a gun across state lines without a license, in violation of 18 U.S.C. § 371. Essentially, he sold a handgun to two men in Pennsylvania and then drove them (and the gun) back to New York.

The parties stipulated that the base offense level (under U.S.S.G. § 2K2.1(a)(6)) was 14. No other adjustment, apart from a two-level reduction for acceptance of responsibility, was applicable. The agreement specified that "neither party will seek" -- "or in any way suggest" to the district court -- "any [] adjustment pursuant to the Guidelines that is not set forth

2

herein." The parties stipulated that the range was 10 to 16 months.

Prior to sentencing, however, the Government asked the district court to "find by a preponderance of the evidence that the defendant knew, or should have known, that [the two men to whom he sold the gun] intended to engage in an act of mass violence" with that weapon. Though the Government did not cite a Guideline provision, a four-level enhancement is required if the district court accepted its claim. See U.S.S.G. § 2K2.1(b)(6)(B) (four-level enhancement if defendant "transferred any firearm [] with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony"). The Government asked the court to impose the statutory maximum sentence of five years' imprisonment.

The Government offered nothing new to support its allegation that Hakime "became a critical part" of the purchasers' plan and "clearly knew, or should have known, of [their] hateful intent when [he] trafficked the Firearm and Ammunition to them." Hakime denied knowing or suspecting the buyers' plan.

The district court conducted an evidentiary hearing to resolve the dispute regarding Hakime's knowledge. And though it ultimately rejected the Government's claim, it varied upwardly from the Guidelines range set forth in the plea agreement (and the PSR).

On February 5, 2024, District Judge Analisa Torres sentenced Hakime to 27 months' imprisonment followed by three years of

3

supervised release. The court also imposed the $100 special assessment.

On appeal, this Court continued the Federal Defenders of New York, Inc., Appeals Bureau, as counsel to Hakime under the Criminal Justice Act.

**STATEMENT OF FACTS**

1. <u>Offense conduct</u>

The following account is undisputed. All information was available before Hakime's guilty plea.

A. <u>Brown, Mahrer, and Hakime</u>

Christopher Brown is a 21-year-old man who suffers from mental illness. <u>See</u> Appendix ("A.") 103. Brown lived on Long Island. His family told police that Brown was a "Nazi" who "hated Jews." A.104.

In the early morning hours of November 18, 2022, he posted on Twitter that he was "Gonna ask a Priest if I should become a husband or shoot up a synagogue and die" and that "This time I'm really gonna do it." A.103-04. <u>See generally</u> Presentence Report ("PSR") ¶¶ 10-13.[1]

Hakime did not know Brown. A.217. Hakime is 59 years old. He worked and lived in Manhattan. PSR ¶¶ 13 & 57.

Brown was friends with 22-year-old Matthew Mahrer. A.103.

---

[1] A copy of the PSR, initially prepared on June 14, 2023, and revised on July 11, 2023, has been submitted to the Court under seal. Included is an Addendum responding to the parties' objections as well as a Sentencing Recommendation to the district court.

Mahrer lived in Manhattan and knew Hakime. A.103.

On the afternoon of November 18th, Brown met Mahrer in Manhattan and discussed buying a gun. A.104. Mahrer then called Hakime. Id.

Hakime arrived by car. He drove Brown and Mahrer to Pennsylvania, where he co-owned a house in the Poconos. Id. See generally PSR ¶¶ 14-17.

B. Two phone calls during the trip to Pennsylvania

Two relevant phone calls occurred during the two-hour car ride. Hakime drove and Mahrer rode in front. Brown sat in back. A.218.

1. Detective Schneider's call to Brown

First, Detective Schneider of the NYPD called Brown's cellphone. He did so because Brown's family contacted the NYPD about his tweets, mental illness, and plan to meet Mahrer. A.104.

The Detective did not say anything to Brown about a gun or an attack on a synagogue. A.218. Instead, he asked Brown if he was the person who "was tweeting about suicidal thoughts" and if "he had social media." A.205-06.

Brown denied everything and hung up. Id. He then deleted the posts on Twitter. Id.[2]

2. The call with inmate Wright

---

[2]    There is no evidence that Hakime saw or was aware of Brown's tweets.

5

Second, Mahrer called an inmate named Wright, incarcerated on a gun conviction. A.106. Hakime also knew Wright -- they lived in the same building on Second Avenue. Mahrer put his call on speakerphone. Id.

Among other things, Hakime said that he was about to sell a gun to Brown and Mahrer and that he could procure various firearms for Wright. Id. Hakime also indicated that he "took over [Wright's] spot," which the Government interpreted as "an apparent reference to the fact that, following [Wright's] arrest, [Hakime] apparently took over [the] 'spot' for trafficking firearms" in their building. A.106.

C.   The sale in Pennsylvania

After arriving at his house in the Poconos, Hakime gave Brown and Mahrer, in exchange for $650, a "generation 5 Glock 7 with an extended magazine . . . and a weapon-mounted light and red dot optic device that allows a user to have better aim . . . ." A.104.

Hakime also supplied 19 rounds of ammunition and instructed the men on how to use the gun. Id. He further asked them to wipe off his fingerprints from the gun. A.206

D.   State authorities arrest Brown and Mahrer

Hakime then drove Brown and Mahrer and their gun back to New York. He dropped them off at Mahrer's apartment in Manhattan. A.104. See generally PSR ¶¶ 17-19.

Brown and Mahrer hid the gun in Mahrer's bedroom and traveled

6

to Penn Station. <u>Id.</u>

A Mahrer family member found the gun and called the police. A.18 The police retrieved the weapon and arrested Brown and Mahrer at Penn Station. A.105.

Brown was found with a large hunting knife and a Swastika armband. A.105.

Brown and Mahrer were charged in state court with firearms offenses. Brown was also charged with making terroristic threats. A.105 n.1.

E.   <u>Hakime's federal arrest two weeks later</u>

Brown and Mahrer's arrest made headlines. Multiple media outlets repeated law-enforcement's claim that they posed a "developing threat to the Jewish community." Accounts highlighted Brown's Swastika armband and tweets about "shoot[ing] up a synagogue." <u>See, e.g.</u>, <u>Two Men Arrested in Threat to New York's Jewish Community Are Charged</u>, New York Times, Nov. 20, 2022, available at https://www.nytimes.com/2022/11/20/nyregion/new-york-jewish-synagogue-threat.html.

Police watched Hakime for about two weeks. <u>See generally</u> PSR ¶¶ 20-25. During this time, they saw him entering and leaving the Second Avenue building where he (and Wright and Wright's wife) lived, carrying various garbage bags into his car (which he then drove to his Poconos house). A.107. Based on recorded phone calls between Wright and his wife, the Government claimed that Hakime,

spooked by Brown and Mahrer's arrest, was disposing of evidence of his gun trafficking. A.21-22.

Agents arrested Hakime on December 2nd. PSR ¶ 25.

Agents searched his Pennsylvania house the same day. A.115. They found no evidence of gun trafficking.

Nor did they find evidence of anti-Semitism. Id. To the contrary, Hakime's partner "is a practicing Jew[] and their [co-owned] home in the Poconos is filled with Judaica." A.114. Hakime's father is also Jewish. Id.

2. Complaint and indictment

Hakime was arrested on a federal complaint. A.13-22. The complaint charged him with conspiring to transport, and transporting, a gun across state lines without a license, as well as with being a felon in possession of a gun. Id.

The complaint does not mention Brown's tweets or the buyers' purported plan for the gun.

Nor does the indictment, which charged Hakime with the same three offenses set forth in the complaint. A.23-28.

Count One charged him with conspiring to transport a gun across state lines, in violation of 18 U.S.C. § 371. Count Two charged the substantive offense of unlicensed firearms transportation, in violation of 18 U.S.C. § 922(a)(3). And Count Three charged him with possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g)(1). Id.

8

3.   <u>The detention hearing</u>

The Government sought Hakime's detention during the pendency of the case based both on dangerousness and risk of flight. A.35. But while the prosecutor mentioned Brown's "shoot up a synagogue" tweet, <u>id.</u>, she did not attempt to link it to Hakime or suggest that he knew of Brown's anti-Semitic proclivities. She relied, instead, on the nature of the offense itself; Hakime's discussions with Wright about selling other guns; Hakime's alleged attempt to destroy evidence; and Hakime's criminal history.

Defense counsel stated, among other things, that "there is no indication that Mr. Hakime was aware of what these other people may have intended to do." A.49. The Government did not disagree.

The judge ordered detention. A.58-63. Hakime has been incarcerated since his arrest on December 2, 2022.

4.   <u>Plea agreement</u>

The parties reached a plea agreement in early March 2023. A.64-69. Hakime would plead guilty to Count One -- the § 371 conspiracy -- and the Government would dismiss the other counts. A.64.

A.   <u>The stipulated Guidelines calculation</u>

The parties "stipulate[d] to the following" Guideline calculations in the agreement. A.64-66.

First, the base offense level is 14, under U.S.S.G. § 2K2.1(a)(6), because Hakime "was a prohibited person" at the time

9

of the offense. A.65.

Second, a two-level reduction, under U.S.S.G. § 3E1.1(a), is warranted for acceptance of responsibility. Id.

That yields a final offense level of 12. Id.

Third, Hakime "has zero criminal history points" and thus falls in Category I. A.66.[3]

Finally, at offense level 12 and Category I, "the defendant's stipulated Guidelines range is 10 to 16 months' imprisonment ('the Stipulated Guidelines Range')." A.66.

B. The parties agree not to "seek" or "in any way suggest" a Guideline enhancement

The parties agreed that each may seek a § 3553(a) variance from the Stipulated Guidelines Range. A.66.

However, the parties agreed not to dispute the applicable Range or challenge the underlying Guidelines calculations, as set forth in the agreement. In particular, the parties agreed that neither would seek from the sentencing court -- or even "in any way suggest" to the court -- an enhancement or reduction ("adjustment") not mentioned in the agreement:

> [N]either party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

A.66.

---

[3] He has a number of prior convictions that are either too old or otherwise uncounted by the Guidelines. See A.65-66.

5.  <u>Hakime pleads guilty</u>

Pursuant to the plea agreement, Hakime pleaded guilty to Count One's § 371 gun-trafficking conspiracy in March 2023. A.70-91.

Among other things, District Judge Torres reminded Hakime that "you and the government have agreed on the appropriate calculation of your sentence under the guidelines." A.83. And "the agreement is that the appropriate guideline range is 10 to 16 months' imprisonment." <u>Id.</u>

The Judge emphasized to Hakime that "pursuant to your agreement, neither you nor the government are allowed to argue to me for a different guideline calculation other than the one in the agreement, although you may seek a sentence outside that range." <u>Id.</u>

Hakime admitted his guilt -- "I agreed with other people to violate federal law by unlawfully transporting a gun from Pennsylvania to New York." A.87. He said that he drove two men from New York to Pennsylvania; sold them a gun; drove them and the gun back to New York; and was "not a licensed dealer or collector of firearms." A.88.

The prosecutor accepted Hakime's allocution. A.88. And in her "summar[y]" of the Government's evidence against Hakime at a potential trial, A.88-89, the prosecutor said nothing about the buyers' plans for the gun.

11

6.   <u>The PSR</u>

The Probation Office prepared a draft of the PSR on June 14, 2023, and issued a final version on July 11th. <u>See</u> PSR at 1. It recommended a 16-month sentence. <u>See</u> PSR Sentencing Recommendation.

Two points are relevant -- the PSR's Guidelines calculation and its discussion of the purchasers' purported plan for the gun.

A.   <u>The Guidelines range is 10 to 16 months</u>

The PSR agreed with the Guidelines calculation in the plea agreement. PSR ¶¶ 29-49. The base offense level is 14; the sole adjustment is a two-level reduction for acceptance of responsibility; and the range is 10 to 16 months. <u>Id.</u> & ¶ 92.

B.   <u>"The Government provided no information that HAKIME was aware of the plot against synagogues."</u>

The initial version of the PSR did not include any discussion of Brown's "shoot up a synagogue" Tweet, his Nazism, or Hakime's awareness of them or the buyers' plan for the gun. PSR Addendum at 24. But the Government e-mailed the Probation Office after receiving the draft and asked that this information -- "additional information regarding the background of the offense conduct" -- be included in the final PSR. <u>Id.</u>

Probation agreed and added it to the PSR. <u>See</u> PSR addendum at 24 and PSR ¶¶ 10-13. Under the title "<u>Background</u>," these paragraphs describe "an apparent plot involving Matthew Mahrer and Christopher Brown to attack one or more synagogues in New York City in furtherance of an anti-Semitic agenda." PSR ¶ 10.

But, the PSR emphasized, "[t]he Government provided no information that HAKIME was aware of the plot against synagogues." PSR ¶ 10.

Hakime nonetheless objected to the inclusion of this information. A.115 & 117. Counsel agreed with Probation that "there is no evidence that Mr. Hakime was aware" of Brown's threat. And because these paragraphs "inappropriately suggest that Mr. Hakime had knowledge of Mr. Brown's purported plot," they should be deleted. A.117.

7.  The Government claims that Hakime knew of the buyers' plan and should be sentenced to the statutory maximum.

Defense counsel wrote the court and asked for a "time served" sentence followed by six weeks of home detention while on supervised release. A.92-102. Because Hakime had already spent eight months in jail by this time, this sentence fell within the 10 to 16 months ("Zone C") range. A.92.

Hakime wrote the court himself. He was "truly sorry" and felt "shame and guilt" for his conduct. A.99.

The Government wrote the court before sentencing and claimed, for the first time, that Hakime "clearly knew, or should have known, of Brown's and Hakime's hateful intent when [he] trafficked the Firearm and Ammunition to them." A.109. The prosecutor said that Hakime was "a critical part" of the buyers' "plan to attack a synagogue in New York" and that "he aided Brown's plan to 'shoot up a synagogue' by arming Brown and Mahrer with a powerful gun and

13

many rounds of ammunition, and training Brown how to use the gun."
Id.

Given the "hours" that Hakime spent with Brown and Mahrer in the car, the fact that a detective called Brown during the ride, and Hakime's "close phone contact with Mahrer up until minutes before Mahrer and Brown were arrested," the Government argued, "[i]t strains credulity to believe that [Hakime] was completely unaware of" Brown's "threatening Twitter posts" or "what [the two men] intended to do with the weapons he supplied them." A.109-10.

And given, in addition, that Hakime discussed selling guns to Wright and concealed evidence of his gun trafficking, the Government claimed that "the applicable Guidelines of 10 to 16 months' imprisonment" -- the range it stipulated to in the plea agreement -- is "woefully inadequate to reflect the nature and circumstances of this offense." A.110. Rather, a "statutory maximum sentence of five years' imprisonment is the only sentence sufficient to reflect the dangerousness and seriousness of the defendant's conduct." Id.

14

8. <u>Hakime denies the Government's allegation and asserts that it breached the plea agreement.</u>

The Government's stunning accusation led to numerous rounds of briefing by the parties, an adjournment of the original sentencing, and, eventually, an evidentiary hearing before the district court to resolve the "factual dispute" regarding Hakime's awareness of the buyers' plan.

A. <u>The Government repeatedly asserts to the sentencing court that Hakime knew or should have known that the buyers intended to use the gun to commit mass murder.</u>

In its briefing to the court, the Government repeatedly asserted that Hakime knew or should have known that Brown and/or Mahrer intended to "shoot up a synagogue" -- or, more generally, commit an act of mass violence -- with the gun he sold them. <u>See, e.g.,</u> A.109 (Hakime "clearly knew, or should have known, of Brown's and Hakime's hateful intent when [he] trafficked the Firearm and Ammunition to them"); A.126 (Detective's testimony "is highly relevant to the defendant's knowledge of [the gun's] intended use by his co-conspirators, Christopher Brown and Matthew Mahrer"); A.127 ("The Government will argue that the defendant knew or should have known that Brown and Mahrer intended to use this dangerous weapon for the purpose of perpetrating mass harm."); A.185 (Hakime "knew without a shadow of a doubt that the firearm was intended not just for personal use, not for self-defense, but for immediate use and for an act of violence."); A.204 ("[T]he defendant knew, or should have known, that Brown and Mahrer intended to use the

15

firearm the defendant sold them to inflict mass harm."); A.241 ("[T]he evidence . . . demonstrates, by a preponderance of the evidence, that the defendant knew, or should have known, that Brown and Mahrer intended to engage in an act of mass violence."); A.244 (same).

B. Hakime denies knowledge and argues that the Government breached the plea agreement.

Hakime denied knowing or suspecting that Brown and/or Mahrer intended to commit mass murder with the gun. See, e.g., A.114 (Hakime "had no knowledge of what the passengers intended to do with the gun"); A.214 ("no reliable evidence" shows that Hakime knew or suspected the buyers' plan).

"There is no evidence that Mr. Hakime had any knowledge of Mr. Brown's 'antisemitic' agenda," counsel noted. A.114. Hakime is half-Jewish. And his "partner is a practicing Jew[] and their home in the Poconos is filled with Judaica." Id.

Hakime also complained to the district court that the Government breached the plea agreement by arguing that he knew of the buyer's evil plan when he sold the gun. A.215-16.

Defense counsel pointed out that the Stipulated Guidelines calculation in the plea agreement did not include any enhancements to the offense level. And the Government specifically agreed not to "seek" or "in any way suggest" to the court "any [] adjustment [] to the Guidelines that is not set forth herein." A.216 (quoting plea agreement).

16

But, counsel noted, Section 2K2.1(b)(6)(B) requires the court to impose a four-level enhancement when the defendant transferred a gun with "knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." A.215 (quoting U.S.S.G. § 2K2.1(b)(6)(B)). Therefore, "the Government's argument that Mr. Hakime 'knew or should have known that Brown and Mahrer intended to use the firearm for an act of mass violence' . . . is a clear breach of its promise not to suggest that the Court consider an adjustment under the Guidelines." Id.

That the Government "disguised [its argument] as a request for a variance" from the Stipulated Guidelines Range, rather than an adjustment to that Range, is irrelevant. A.216. The substance (and effect) is the same. Id.

Hakime did not want to withdraw his plea. To remedy the Government's breach, he asked the court to "not consider" its argument in determining his sentence. A.216.

The Government denied breach. A.240-41. The agreement allowed the Government to argue for a variance above the Stipulated Range based on a consideration of the § 3553(a) factors. A.240. "[T]he fact that the Government could have, but did not, seek a sentencing enhancement under a particular provision of the Guidelines" in light of Hakime's knowledge of the buyers' murderous intent is of no moment. A.241. That its claim (if accepted) would require the

court to impose a four-level enhancement not found in the plea agreement "in no way preludes the Government from [] seeking a variance based on the Section 3553(a) factors" for the same reason. Id.

9. <u>The court conducts an evidentiary hearing, rejects the Government's argument, and imposes an above-range sentence.</u>

Given these "factual disputes," the district court conducted an evidentiary hearing on October 5, 2023. A.136-203. The parties submitted numerous exhibits. A.120-24. Detective Schneider testified.

Before and after the testimony, the court heard argument from counsel on the Government's claim that Hakime "clearly knew or should have known of Brown and Mahrer's hateful intent when [he] trafficked the firearm and ammunition to them." A.137. Defense counsel denied that Hakime knew or should have known of the buyers' intent. A.139. The prosecutor claimed that "a preponderance of the evidence [proves] that the defendant knew that when he provided this firearm to Christopher Brown and Matthew Mahrer, that they intended to use it for an act of mass violence." A.170.

The court reserved decision at the end of the hearing. A.202-03.

18

A.   <u>The court rejects the Government's argument</u>

Sentencing occurred on February 6, 2024. A.249-84.

At the start, the court rejected the Government's claim regarding Hakime's knowledge. While "Mr. Hakime's decision to provide the gun was reckless, . . . the Court holds that the government did not prove by a preponderance of the evidence that Mr. Hakime knew or should have known of the purchasers' purported plan to commit an act of mass violence." A.253-54.

The court adopted the Guidelines calculations and range (10 to 16 months) set forth in the PSR and the agreement. A.259. It then heard from the parties.

B.   <u>The Government seeks the statutory maximum</u>

The Government lost its principal argument, but did not back down. Rather, the prosecutor asserted that "[t]he defendant sold an incredibly dangerous weapon to two troubled youths that was designed to kill"; "trained [them] how to use the firearm; and "directed them to wipe his fingerprints from it." A.259-60. Although this case "luckily did not involve a massacre," the prosecutor said, "it easily could have been." A.260.

And regardless of the court's finding on Hakime's knowledge, "the Court can and should take into account the devastating consequences that could have resulted" from his sale of the gun to men who "intended to use the firearm for purposes of an attack on a synagogue." A.260. The prosecutor then publicly thanked "several

19

members of the Jewish community" -- people "who felt the consequences of that fateful day [] particularly closely in their community" -- present in the courtroom that day. Id.

The Government asked the court to punish Hakime to the full extent of the law – five years' imprisonment. A.264.

C.    The defense requests a within-range sentence

By this time, Hakime had spent the past 14 months in jail. Counsel asked the court to impose a sentence of time served, well within the range. A.267. Counsel emphasized Hakime's age, long history of law-abiding behavior, overall good character, and the harsh conditions he endured while incarcerated at the MDC Brooklyn. A.265-67.

Hakime told the court that he "deeply regret[s]" and was "truly sorry" for his actions. A.270.

D.    The court upwardly varies and imposes a 27-month sentence

The court found, after canvassing the § 3553(a) factors, that the Guidelines range did "not adequately reflect the seriousness of the crime and the dangerousness of the weapon that Mr. Hakime trafficked." A.275. The court focused on specific attributes of that gun and said that "an upward variance is warranted to reflect both the dangerousness of the firearm and the recklessness of [his] sale" of it to Brown and Mahrer. A.276.

The court imposed a 27-month term of imprisonment. A.280.[4]

E.    Counsel preserves the defense's claim of breach

The court did not discuss defense counsel's claim that the Government breached the plea agreement by making this argument. Counsel preserved his objection, stating at the close of sentencing "for the record" that "the government breached its plea agreement" with Hakime. A.282.[5]

## SUMMARY OF ARGUMENT

This Court "hold[s] prosecutors engaged in plea bargaining to the most meticulous standards of both promise and performance." United States v. Lawlor, 168 F.3d 633, 636 (2d Cir. 1999). The Government must "comport with the highest standards of fairness" when it enters a plea agreement with a criminal defendant. Id. at 637.

The Government failed to live up to those standards and breached its plea agreement with Jamil Hakime. Its advocacy at sentencing violated both the plain language and spirit of its pledge to the defendant.

In the plea agreement, the Government pledged not to seek from the district court -- or "in any way suggest" to the court -- "any [Guidelines] adjustment" that is "not set forth" in the agreement.

---

[4]  The court's written Statement of Reasons has been submitted under seal.

[5]  Neither the court nor the Government responded.

21

The only "adjustment" mentioned in the agreement is a two-level reduction for acceptance of responsibility.

The agreement did not include an adjustment frequently imposed in gun cases -- the four-level enhancement found in U.S.S.G. § 2K2.1(b)(6)(B). This enhancement is required if the defendant "transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."

But despite its agreement, the Government argued repeatedly before sentencing that "the Court should find by a preponderance of the evidence that the defendant knew, or should have known, that Brown and Mahrer intended to engage in an act of mass violence" with the gun he sold them. If the district court accepted this argument, it was required to impose a four-level enhancement.

The Government's sentencing advocacy thus constitutes, at the least, a "suggest[ion]" that the court impose an adjustment not found in the plea agreement. But the agreement specifically bars the prosecutor from "in any way suggest[ing]" an adjustment.

More generally, the Government failed to meet the "highest standards of fairness," by which its conduct in plea bargaining is measured, by taking a position at sentencing that no reasonable defendant could have anticipated given the overall circumstances of the case. That the district court ultimately rejected the Government's claim is of no moment. "Whether a breach by sentence

advocacy caused prejudice in the form of an increased sentence is irrelevant to the need for a remedy." <u>United States v. Vaval</u>, 404 F.3d 144, 154 (2d Cir. 2005).

The Court should therefore order the standard remedy for a breach in this context -- vacatur of the sentence and remand to a different judge for resentencing.

**ARGUMENT**

**The Government breached the plea agreement by arguing at sentencing that Hakime knew or should have known of the buyers' murderous intent when he sold the gun to them.**

The Government pledged to Jamil Hakime that it would not "in any way suggest" to the district court any enhancement to his offense level under the Guidelines. In exchange for that promise and an agreement a Stipulated Guidelines Range of 10 to 16 months, Hakime waived fundamental constitutional rights and pleaded guilty.

The Government then reneged on its promise. Without new facts or changed circumstances, the prosecution decided to argue to the district court that Hakime deserved to spend five years in prison -- the statutory maximum -- because he knew or should have known that the men to whom he sold a gun intended to use that weapon to commit mass murder.

If the court accepted the Government's claim regarding Hakime's mental state, it was required to impose a four-level enhancement under U.S.S.G. § 2K2.1(b)(6)(B) -- he transferred the gun with "knowledge, intent, or reason to believe that it would be

23

used or possessed in connection with another felony offense." The Government thus failed to honor its pledge not to "in any way suggest" a Guidelines enhancement to the court.

The Government's conduct fell far short of the "meticulous standards of performance" that this Court demands of prosecutors when a defendant has "waive[d] fundamental constitutional rights" in a plea bargain. United States v. Vaval, 404 F.3d 144, 152-53 (2d Cir. 2005). The appropriate remedy is to vacate the sentence and remand for resentencing before a new district judge. Id. at 156.

**A.  "[P]rosecutors engaged in plea bargaining" are held to "the most meticulous standards of both promise and performance" and must "comport[] with the highest standards of fairness."**

The Court "review[s] interpretations of plea agreements de novo and in accordance with principles of contract law." United States v. Griffin, 510 F.3d 354, 360 (2d Cir. 2007).[6] But plea agreements are "unique contracts, and we temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards." United States v. Granik, 386 F.3d 404, 413 (2d Cir. 2004).

In particular, this Court closely scrutinizes plea agreements to protect the criminal defendant, both because "the government ordinarily has awesome advantages in bargaining power," United

---

[6] The appellate waiver in the plea agreement is inapplicable because the above-range 27-month sentence is beyond the waiver limit (16 months or less). A.67. Moreover, the Government's breach vitiates the waiver. United States v. Mammedov, 304 F. App'x 922, 924 (2d Cir. 2008); see infra.

States v. Reira, 298 F.3d 128, 133 (2d Cir. 2002), and because the "defendant[] [is required] to waive fundamental constitutional rights," United States v. Lawlor, 168 F.3d 633, 636 (2d Cir. 1999) (internal quotations omitted).

"We construe plea agreements strictly against the government." Vaval, 404 F.3d at 152. "[A]ny ambiguities in the agreement must be resolved in favor of the defendant." Reira, 298 F.3d at 133; see Griffin, 510 F.3d at 364 ("We have [] strictly enforced plea agreements against the government where [] the disputed issue concerned enhancements or adjustments to a defendant's total offense level . . . .").

More generally, the Court "hold[s] prosecutors engaged in plea bargaining to the most meticulous standards of both promise and performance." Lawlor, 168 F.3d at 636. This Court has long "admoni[shed] . . . the government . . . [to] take much greater care in fulfilling its responsibilities where plea agreements are involved." United States v. Brody, 808 F.2d 944, 948 (2d Cir. 1986). And "[g]iven the government's often decisive role in the sentencing context, [this Court] will not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standards of fairness." Lawlor, 168 F.3d at 637.

**B.   A breach occurs when the Government's conduct at sentencing "raises doubts [about] whether defendant could reasonably" have expected it when entering the agreement.**

"To determine whether a plea agreement has been breached, a court must look to what the parties reasonably understood to be the terms of the agreement." Vaval, 404 F.3d at 152 (internal quotations omitted). "[W]e look both to the precise terms of the plea agreement[] and to the parties' behavior. We seek to determine what 'the reasonable understanding and expectations of the defendant [were] as to [what] he had bargained'" for. United States v. Wilson, 920 F.3d 155, 163 (2d Cir. 2019) (quoting United States v. Paradiso, 689 F.2d 28, 31 (2d Cir. 1982)).

A breach occurs when "the Government's change of position (without new justifying facts) changed the defendant's exposure so dramatically as to raise doubts about whether the defendant could reasonably be seen to have understood the risks of the agreement." United States v. Habbas, 527 F.3d 266, 271 (2d Cir. 2008). When the "defendant ha[s] a reasonable expectation that the Government would not press the Court for an enhanced offense level in the absence of new information," for instance, the Government breaches the agreement by such conduct. United States v. Palladino, 347 F.3d 29, 34 (2d Cir. 2003).

**C.   Formal compliance does not insulate a breach when the "net effect" of the Government's "overall conduct" undermines the benefit of the bargain upon which the defendant relied in pleading guilty.**

"[T]he focus is on the defendant's reasonable expectations –

26

'rather than technical distinctions in semantics . . . .'" <u>Wilson</u>, 920 F.3d at 163 (quoting <u>Gammarano v. United States</u>, 732 F.2d 273, 276 (2d Cir. 1984)). And what matters is the substance of the Government's conduct, not formal disclaimers and "lip service."

A breach occurs despite formal disclaimers to the contrary when the prosecution acts contrary to the promises it made to the defendant. The "circumstances must be carefully studied in context." <u>United States v. Amico</u>, 416 F.3d 163, 167 n.2 (2d Cir. 2005). And "where the government's commentary reasonably appears to seek to influence the court in a manner incompatible with the agreement, [the Court] will not hesitate to find a breach, notwithstanding formal language of disclaimer." <u>Id.</u>

As <u>Vaval</u> warned, statements by a prosecutor claiming that she intends to abide by the plea agreement "do not insulate the government against a finding of breach if in fact what was said constituted an argument" contrary to promises made in the agreement. 404 F.3d at 153. The Government "must serve more than simple 'lip service to, or technical compliance with, the terms of a plea agreement . . . because the defendant is entitled to both the benefit of the bargain struck in the plea deal and to the good faith of the prosecutor.'" <u>United States v. Cortes-Lopez</u>, __ F.3d ___, 2024 WL 2104676, at *4 (1ˢᵗ Cir. May 10, 2024) (quoting <u>United States v. Lessard</u>, 35 F.4th 37, 42 (1ˢᵗ Cir. 2022)). The Government may neither "explicit[ly] repudiat[e]" its obligations nor "end-

27

run[]" them with a claim of formal compliance "when the net effect of the government's behavior 'undermines the benefit of the bargain upon which a defendant has relied.'" Id. at *7 (quoting United States v. Frazier, 340 F.3d 5, 10 (1st Cir. 2003)).

**D.  The Government breached the plea agreement by asking the district court to find by a preponderance of the evidence that Hakime knew or should have known of the buyers' murderous intent.**

The Government violated the clear language of the plea agreement and upset Hakime's reasonable expectations of his bargain when it argued at sentencing that Hakime knew or should have known that Brown and Mahrer planned to use the gun to commit mass murder. Claiming that "the evidence . . . demonstrates, by a preponderance of the evidence, that the defendant knew, or should have known, that Brown and Mahrer intended to engage in an act of mass violence," A.241, is tantamount to asking the court to impose the four-level enhancement in § 2K2.1(b)(6)(B), required when the defendant transfers a gun with "knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."[7]

But the agreement barred the Government from "in any way suggst[ing]" to the court that this enhancement applied. As it promised, the Government would not "seek" or "in any way suggest"

---

[7]  The enhancement "does not require that the firearm will actually be used in connection with another felony so long as the defendant had 'reason to believe' it would." United States v. Leach, 182 F.3d 901, 1999 WL 491855 at *1 (2d Cir. 1999).

28

to the court any Guidelines adjustment not found in the agreement. And the agreement did not include this (or any other) enhancement.

Section 2K2.1(b)(6)(B) is well-known -- its four-level enhancement applied in more than 28% of firearms cases nationwide. See United States Sentencing Commission, What Do Federal Firearms Offenses Really Look Like? (July 2022). Telling the court that the defendant transferred a gun to someone while knowing that the buyer intended to use it to commit mass murder therefore qualifies, at the least, as a "suggest[ion]" that the court impose this enhancement. Citing the provision by number-and-letter was unnecessary; the Government's sentencing advocacy sufficed to "suggest" its applicability. The Government thus sought to "influence the court in a manner incompatible with the agreement." Amico, 416 F.3d at 167 n.2.

Nothing changed between the plea and the sentencing to justify the prosecution's dramatic shift regarding Hakime's mental state and culpability. Having pleaded guilty under an agreement in which the Government "stipulated" that the Guidelines range was 10 to 16 months -- and that no enhancement based on his knowledge of the buyer's plans was applicable -- Hakime had every reason to believe that the Government would not argue to the sentencing court that he did, in fact, know of the buyer's murderous intent and should receive the statutory maximum punishment as a result. Under these circumstances, it was "logical for [Hakime] to believe that . . .

29

the Government's stance at the sentencing hearing [] would not be altered in the absence of new information." <u>Palladino</u>, 347 F.3d at 34.

That the Government did not seek the enhancement explicitly does not save its breach. Simply put, the court could not make the fact-finding requested by the Government ("Hakime knew of the buyers' murderous plan!") without imposing the enhancement in § 2K2.1(b)(6). Given the ubiquity of this "adjustment," the Government did not have to specifically ask for it. Telling the court that the enhancement's factual underpinnings existed sufficed. As this Court has long noted, "where the government's commentary reasonably appears to seek to influence the court in a manner incompatible with the agreement, we will not hesitate to find a breach, notwithstanding formal language of disclaimer." <u>Amico</u>, 416 F.3d at 167 n.2.

Even worse, the Government declined to disavow the enhancement's applicability when given the chance to do so. Defense counsel below made the same point we make here -- the Government's sentencing advocacy breached the agreement because its claim regarding Hakime's knowledge, if accepted, would require a four-level enhancement not contemplated by the agreement. A.215-16. But instead of withdrawing its argument -- or simply disavowing § 2K2.1(b)(6)'s applicability -- the Government relied on technicalities to answer that it had done nothing wrong. A.240-41.

30

The "express terms" of the agreement, the Government insisted, allowed it to argue that Hakime knew of the buyers' murderous plan and deserved the harshest punishment available (as a § 3553(a) upward variance). A.240. That its advocacy "could have" triggered "a particular provision of the Guidelines," the prosecution retorted, "in no way precludes the Government from [] seeking a [§ 3553(a)] variance" for the same reason. A.241.

This misunderstands the Government's obligation in fulfilling the promises it made in a plea agreement. "The highest standards of fairness" mean that more than strict compliance is required when its overall conduct undermines its pledge to the defendant. "[W]here the government's commentary reasonably appears to seek to influence the court in a manner incompatible with the agreement, [the Court] will not hesitate to find a breach, notwithstanding formal language of disclaimer." Amico, 416 F.3d at 167 n.2; see Vaval, 404 F.3d at 153 (statements by prosecutor that she intends to abide by plea agreement "do not insulate the government against a finding of breach if in fact what was said constituted an argument" contrary to promises made in the agreement). The Government may neither "explicit[ly] repudiat[e]" its obligations nor "end-run[]" them with a claim of formal compliance. Cortes-Lopez, __ F.3d ___, 2024 WL 2104676, at *7-*8.

The Government promised to Hakime that it would not "in any way suggest" an enhancement to the sentencing court. But the

Government did exactly that when it argued that he should get the statutory maximum because he knew of the buyers' murderous plan when he sold the gun, a mental state that would trigger a frequently imposed four-level enhancement.

Holding the Government to the "highest standards of fairness," evaluating its conduct by "the most meticulous standards of both promise and performance," and construing all ambiguities in Hakime's favor, as required, leads to the conclusion that "the net effect of the government's behavior undermines the benefit of the bargain upon which [Hakime] relied.'" Cortes-Lopez, __ F.3d ___, 2024 WL 2104676, at *4. The Government broke its pledge to Hakime by seeking to "influence the court in a manner incompatible with the agreement." Amico, 416 F.3d at 167 n.2.

**E. The court should enforce the bargain by remanding the case for resentencing before a different judge.**

That the district court ultimately rejected the Government's claim, after receiving several rounds of briefing and sitting through an evidentiary hearing, is of no moment. "Whether a breach by sentence advocacy caused prejudice in the form of an increased sentence is irrelevant to the need for a remedy." Vaval, 404 F.3d at 154. "[I]n order to preserve the integrity of plea bargaining procedures and public confidence in the criminal justice system, a defendant is generally entitled to the enforcement of a plea agreement without showing a tangible harm resulting from a breach." Id. at 155 (relying on Santobello v. New York, 404 U.S. 257, 262

(1971)). <u>Cf.</u> <u>Cortes-Lopez</u>, __ F.4th at __, 2024 WL 2104676, at *8 ("[I]n our evaluation of prejudice we [] keep in mind that, in agreeing to plead guilty, a defendant waives important constitutional rights . . . not in exchange for the actual sentence or impact on the judge, but for the prosecutor's statements in court. . . . . [T]he <u>quid pro quo</u> from the defendant's point of view . . . [is] the prestige of the government and its <u>potential</u> to influence the district court.") (emphasis in original).

And "to avoid even the appearance of such harm, when we do remand for breach of a government obligation not to engage in sentence advocacy, we direct the case to a different judge, even where the original judge . . . was not influenced by the government's arguments." <u>Vaval</u>, 404 F.3d at 155. That is the remedy we seek here.

## CONCLUSION

For the foregoing reasons, the Court should vacate Hakime's sentence and remand for resentencing before a different district judge.


Respectfully submitted,

FEDERAL DEFENDERS OF NEW YORK, INC.
  APPEALS BUREAU

By: ___/s/_____
  **YUANCHUNG LEE**
  Attorney for Appellant
    **JAMIL HAKIME**
  52 Duane Street, 10th Floor
  New York, New York 10007
  Tel.: (212) 417-8742

**YUANCHUNG LEE,**
    Of Counsel.

---

### CERTIFICATE OF SERVICE

I certify that a copy of this Brief and Appendix has been served by ECF on the United States Attorneys/S.D.N.Y.; Attention: **MITZI STEINER, ESQ., and SARAH KUSHNER, ESQ.,** Assistant United States Attorneys, Southern District of New York, One St. Andrew's Plaza, New York, NY 10007.

Dated:  New York, New York
        May 30, 2024

        ___/s/_____
        **YUANCHUNG LEE**

34

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 7,341 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Corel WordPerfect 9** with **10 characters per inch in courier new** type style.

Attorney for Appellant **JAMIL HAKIME**

Dated:  New York, New York
       May 30, 2024

                           ____/s/_____

                           **YUANCHUNG LEE**