# 24-390

*To Be Argued By*:
MITZI STEINER

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-390

➤◆◆◆➤

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

JAMIL HAKIME,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

SARAH L. KUSHNER,
MITZI STEINER,
MATTHEW R. SHAHABIAN,
 *Assistant United States Attorneys,
Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  Hakime's Offense Conduct, Indictment, and
         Guilty Plea. . . . . . . . . . . . . . . . . . . . . . . . . .  2

    B.  The *Fatico* Hearing. . . . . . . . . . . . . . . . . . .  7

    C.  The Sentencing Proceeding . . . . . . . . . . .  12

ARGUMENT—The Government Did Not Breach the
    Plea Agreement . . . . . . . . . . . . . . . . . . . . . . . . .  15

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  15

    B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . .  18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

# TABLE OF AUTHORITIES

*Cases*:

*In re Altro*,
    180 F.3d 372 (2d Cir. 1999) . . . . . . . . . . . . . 16, 24

*United States v. Amico*,
    416 F.3d 163 (2d Cir. 2005) . . . . . . . . . .  16, 17, 25

*United States v. Brumer*,
    528 F.3d 157 (2d Cir. 2008) . . . . . . . . . . . . . 15, 16

*United States v. Cimino*,
    381 F.3d 124 (2d Cir. 2004) . . . . . . . . . . . . . . . 17

ii

PAGE

*United States v. Fatico,*
603 F.2d 1053 (2d Cir. 1979) . . . . . . . . . . . . . . . . . 3

*United States v. Habbas,*
527 F.3d 266 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 21

*United States v. Howard,*
299 F. App'x 885 (11th Cir. 2008) . . . . . . . . . . . . 25

*United States v. Lawlor,*
168 F.3d 633 (2d Cir. 1999) . . . . . . . . . . . . . . . . . 16

*United States v. Lenoci,*
377 F.3d 246 (2d Cir. 2004) . . . . . . . . . . . . . . . . . 24

*United States v. Martin,*
No. 20-3673, 2022 WL 701712
(2d Cir. Mar. 9, 2022) . . . . . . . . . . . . . . . . . . . 17, 19

*United States v. Moschella,*
727 F.3d 888 (9th Cir. 2013) . . . . . . . . . . . . . . . . 25

*United States v. Parrish,*
755 F. App'x 59 (2d Cir. 2018) . . . . . . . . . . . 17, 19

*United States v. Riera,*
298 F.3d 128 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 16

*United States v. Rivera,*
No. 22-2081, -- F.4th --, 2024 WL 3882099
(2d Cir. Aug. 21, 2024) . . . . . . . . . . . . . . . . . . . . 16

*United States v. Sealed Defendant One,*
49 F.4th 690 (2d Cir. 2022) . . . . . . . 17, 18, 20, 21

*United States v. Sehgal,*
480 F. App'x 16 (2d Cir. 2012) . . . . . . . . . . . . . . 25

iii

PAGE

*United States v. Tokhtakhounov,*
    607 F. App'x 8 (2d Cir. 2015) . . . . . . . . . . . *passim*

*United States v. Vaval,*
    404 F.3d 144 (2d Cir. 2005) . . . . . . . . . .  16, 17, 22

*United States v. Wilson,*
    920 F.3d 155 (2d Cir. 2019) . . . . . . . . . . . . . . . . 23

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 24-390

———————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

JAMIL HAKIME,

*Defendant-Appellant.*

———————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————

### Preliminary Statement

Jamil Hakime appeals from a judgment of conviction entered on February 6, 2024, in the United States District Court for the Southern District of New York, by the Honorable Analisa Torres, United States District Judge, following Hakime's guilty plea.

Indictment 22 Cr. 699 (AT) (the "Indictment") was filed on December 20, 2022, and charged Hakime in three counts. Count One charged Hakime with conspiracy to transport a firearm interstate, in violation of 18 U.S.C. § 371. Count Two charged Hakime with substantive transport of a firearm interstate, in violation of 18 U.S.C. §§ 922(a)(3), 924(a)(1)(D), and 2.

2

Count Three charged Hakime with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8).

On March 14, 2023, pursuant to a plea agreement with the Government, Hakime pled guilty to Count One of the Indictment. On February 6, 2024, Judge Torres sentenced Hakime to a term of 27 months' imprisonment, to be followed by three years' supervised release, and imposed a $100 mandatory special assessment.

Hakime is serving his sentence.

## Statement of Facts

### A. Hakime's Offense Conduct, Indictment, and Guilty Plea

Hakime sold a loaded handgun to two men, Christopher Brown and Matthew Mahrer, who purchased the weapon as part of an antisemitic plot to attack one or more synagogues in New York City.

In the early morning hours of November 18, 2022, Brown posted publicly on the social-media platform Twitter about his intent to "shoot up a synagogue," emphasizing, "This time I'm really gonna do it." (PSR ¶ 10).[1] That same day, after Brown published those

_____

[1] "Br." refers to Hakime's brief on appeal; "A." refers to the appendix filed with that brief; "PSR" and "Presentence Report" refer to the Presentence Investigation Report prepared by the United States Probation Office (the "Probation Office") in connection with

3

posts, Brown and Mahrer sought out Hakime, with whom Mahrer was acquainted, to purchase a firearm and ammunition. Hakime had been employed since approximately 2014 by New York City's Administration for Children Services as a Youth Developmental Specialist in Manhattan. (PSR ¶ 13).

Hakime picked up Brown and Mahrer in Manhattan and drove them to a house Hakime owned in Pennsylvania. During the drive, Mahrer called their mutual associate, Luther Wright, who was incarcerated at a state detention facility. (PSR ¶ 14-16).[2] During the call, which Mahrer put on speakerphone, Mahrer told Wright that Mahrer was with "Jay," a reference to Hakime. (PSR ¶ 15). Hakime then spoke to Wright about obtaining firearms. (PSR ¶ 15). Wright said that he needed to procure a firearm when he was released from custody, as he had lost a Glock 17 firearm when it was seized from his residence on Second Avenue in

_____

Hakime's sentencing; "Dkt." refers to an entry on the District Court's docket for this case; "Tr." refers to the transcript for the sentencing hearing the District Court held on October 5, 2023, pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) (the "*Fatico* Hearing"), and "GX" refers to Government exhibits introduced at the *Fatico* Hearing. Unless otherwise noted, case text quotations omit all internal quotation marks, citations, and previous alterations.

[2]   Wright had been arrested in or about August 2021 for possessing firearms and was serving a 42-month state sentence for criminal possession of a weapon in the second degree. (PSR ¶ 19 n.1).

4

Manhattan—where Hakime also resided—during a search incident to his arrest. (PSR ¶ 15). Hakime told Wright that he could procure whatever type of firearm Wright wanted and that Hakime had taken over firearms trafficking activity for Wright at Wright's former apartment building since Wright's arrest. (PSR ¶ 16).

Once Hakime, Brown, and Mahrer arrived at Hakime's house in Pennsylvania, Hakime retrieved a firearm (the "Firearm") and ammunition (the "Ammunition"). (PSR ¶ 19). The Firearm was a generation 5 Glock 17 with an extended magazine, which allows the firearm to hold up to thirty rounds of ammunition, and a weapon-mounted light and red-dot optic device that allows a user to have better aim at his target. (PSR ¶ 19). The Ammunition included nineteen rounds of 9 mm ammunition. (PSR ¶ 19). Brown and Mahrer paid Hakime approximately $650 for the Firearm and Ammunition. (PSR ¶ 11).

Hakime then drove Brown and Mahrer back to Manhattan with the Firearm and Ammunition. Once back in New York, Brown and Mahrer went to Mahrer's family's apartment in Manhattan where they hid the Firearm and Ammunition in Mahrer's bedroom before heading to Penn Station. (PSR ¶ 17). Later that night, law enforcement officers arrested Brown and Mahrer in Penn Station. (PSR ¶ 18). At the time of their arrests, law enforcement recovered a large hunting knife and a Swastika arm band from a bag that Brown was carrying. (PSR ¶ 18). Law enforcement officers later recovered the Firearm and Ammunition from a backpack in Mahrer's apartment. (PSR ¶¶ 18-19).

5

On November 22, 2022, several days after Brown and Mahrer's arrests, which had been publicized widely in the media, law enforcement observed Hakime packing up garbage bags in the trunk of his vehicle outside Wright's former apartment building, with the help of an individual later identified as Wright's partner. (PSR ¶ 20). Hakime then started driving in the direction of his house in Pennsylvania. Shortly thereafter, Wright and his partner spoke on the phone. (PSR ¶ 22). On that recorded prison call, Wright's partner informed Wright that Hakime was "in trouble," that she had to pack up Hakime's items, and that he was "laying low." (PSR ¶ 22).

On December 2, 2022, Hakime was arrested and charged in a three-count complaint with conspiracy to transport a firearm interstate, in violation of 18 U.S.C. § 371; substantive transport of a firearm interstate, in violation of 18 U.S.C. §§ 922(a)(3), 924(a)(1)(D), and 2; and being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Dkt. 1).

That same day, Hakime was presented before United States Magistrate Judge Stewart D. Aaron. The Government sought Hakime's detention on the ground that, among other things, he posed a danger to the community "by providing a gun and a firearm to two individuals [ ] one of whom had posted earlier that day what his intention was to do with a gun." (A. 38). Magistrate Judge Aaron ordered Hakime detained based on the danger he posed to the community. (A. 55).

6

On December 20, 2022, a Grand Jury in the Southern District of New York returned the Indictment against Hakime, which charged him with the same offenses as those in the complaint. (Dkt. 7).

On March 14, 2023, pursuant to a plea agreement with the Government (the "Plea Agreement"), Hakime pled guilty to Count One of the Indictment, namely, conspiracy to transport a firearm interstate. Count One carried a statutory maximum term of imprisonment of five years, a maximum term of supervised release of three years, a maximum fine of $250,000, and a $100 mandatory special assessment. As set forth in the Plea Agreement, the parties agreed that Hakime's offense level was 12 and that he was in Criminal History Category I, yielding a stipulated Guidelines range of 10 to 16 months' imprisonment (the "Stipulated Guidelines Range").[3] The parties agreed not to "seek any departure or adjustment pursuant to the Guidelines," nor "in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines." (A. 66).

The Plea Agreement further provided, however, that "either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to

_____

[3]    While Hakime had five prior convictions, none was counted towards his criminal history because the sentences were imposed prior to the period recognized under the Guidelines. These prior convictions included, among other things, an August 1986 conviction for burglary and a July 1986 conviction for attempted robbery. (A. 65-66).

7

be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." (A. 66). The Plea Agreement also noted that the Stipulated Guidelines Range was not binding on the District Court, and that Hakime "acknowledges that [his] entry of a guilty plea to the charged offense authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence." (A. 67).

## B. The *Fatico* Hearing

Hakime's initial sentencing submission (A. 92-102), argued for a sentence of time served (at the time, approximately eight months' imprisonment), followed by two years of supervised release. (A. 92-102). Thereafter, the Probation Office issued its final Presentence Report. In the Presentence Report, the Probation Office calculated the applicable Guidelines range consistent with the calculation set forth in the Plea Agreement. (PSR ¶ 6). The Probation Office recommended a top-of-the-Guidelines sentence of 16 months' imprisonment.

In the Government's sentencing submission (A. 103-113), the Government acknowledged that the parties had stipulated to a Guidelines range of 10 to 16 months' imprisonment (A. 108), but requested that the District Court vary upwards under 18 U.S.C. § 3553(a) and impose the statutory maximum sentence of five years' imprisonment because, among other things, Hakime "provided a powerful firearm to two young men who planned to use the weapon to shoot congregants at a synagogue in or around New York City." (A. 103, 108). In support of that request for an

8

upward variance, the Government argued that Hakime "clearly knew, or should have known, of Brown's and Mahrer's hateful intent when the defendant trafficked the Firearm and Ammunition to them." (A. 109). Hakime filed a letter response arguing that, although the crime committed was "very serious," he had "no knowledge of what [Brown and Mahrer] intended to do with the gun." (A. 114). The District Court, in turn, issued an order scheduling an evidentiary hearing to understand the extent, if any, to which Hakime knew what Brown and Mahrer intended to do with the Firearm, and whether Hakime attempted to conceal the extent of his conduct after the fact. (A. 118-119).

On October 5, 2023, the parties appeared before the District Court for the *Fatico* Hearing. At the hearing, the Government called a single witness: Detective Richard Schneider of the New York City Police Department. Detective Schneider testified, among other things, that he had been on duty on November 18, 2022, when he learned of public threats that Brown posted on Twitter about shooting up a synagogue. Later that day, Detective Schneider called Brown and asked Brown whether he had any social media accounts and whether he had any suicidal intentions. (Tr. 14:1-7). Brown responded in a "[n]ormal volume" on the call and became "flustered" when Detective Schneider questioned him. (Tr. 14:13-17).

Detective Schneider also testified about the specific characteristics of the Firearm, which included an extended magazine, scope, and laser. Detective Schneider testified that an extended magazine is "a magazine

9

that is put in the gun that holds more than the manu-
facturer's magazine holds," and therefore, "[h]old[s]
more bullets without having to reload." (Tr. 18:25-
19:5; *see also id.* at 33:7-9 ("With an extended maga-
zine, you have a longer period of shooting than you
would with a normal magazine.")). The extended mag-
azine "double[d]" the ammunition capacity of the Fire-
arm, from eight to fifteen bullets to approximately
thirty bullets. (Tr. 20:16-22). Extended magazines are
illegal in the State of New York. (Tr. 32:23-33:9). An
extended magazine is also difficult, if not impossible,
to conceal. (Tr. 21:16-22:2). The Firearm had a "scope"
secured to the top of the gun, which, as Detective
Schneider testified, "magnifies the target for the
shooter." (Tr. 19:14). The Firearm also had "a laser dot
sight" under the barrel of the gun that "put[s] a target
on the target so you can more easily and quickly shoot
the target." (Tr. 19:24-25). Detective Schneider ex-
plained that the scope and the laser device work to-
gether, with the scope allowing a shooter to "see [a tar-
get] closer" and the "laser red dot sight . . . show[ing]
you exactly where your aiming was going to hit."
(Tr. 20:5-12).

In addition to Detective Schneider's testimony, the
Government introduced historical cellsite data estab-
lishing that Hakime had driven Brown and Mahrer to
his residence in Pennsylvania—including during the
time when Detective Schneider called Brown—and
that they were together for approximately eight hours
in total. (GX 12, 13). The Government also introduced
toll records establishing that Hakime and Mahrer ex-
changed a dozen calls immediately before and after
that trip (GX 6B), including while Brown publicly

10

posted about shooting up a synagogue, and up until Brown's and Mahrer's arrest (GX 12 at 1-2).

Finally, the Government introduced a recording of Brown's *Mirandized* post-arrest interview, during which he stated that his call with Detective Schneider "spooked" him, and that he told Hakime and Mahrer that he (Brown) was "in over [his] . . . head" and that he was "pretty sure that they [i.e., law enforcement] know what we intend to do." (GX 2 at 39:43-40:02). Mahrer also said that Hakime retrieved the Firearm and Ammunition from his home in Pennsylvania, and that Hakime and Mahrer taught Brown how to use the Firearm. (GX 2 at 58:34-59:46). According to Mahrer, Hakime instructed Brown and Mahrer to wipe off his fingerprints from the Firearm. (GX 2 at 1:52:52-1:53:08).

Thereafter, the parties submitted post-hearing briefing. (A. 204-48). In its initial submission, the Government argued that the "undisputed facts alone militate forcefully in favor of imposing the statutory maximum sentence of five years' imprisonment," but that "additional support for such a sentence is found in the uncontested facts from the hearing, which . . . prove by a preponderance of the evidence[ ] that [Hakime] knew, or should have known, that Brown and Mahrer intended to use the [F]irearm [Hakime] sold them to inflict mass harm." (A. 204).

In Hakime's initial post-hearing brief, he argued for the first time that the Government was in breach of the Plea Agreement in seeking an above-Guidelines sentence. (A. 215). While Hakime acknowledged that under the terms of the Plea Agreement, "either party

11

may seek a sentence outside of the Stipulated Guidelines range" based on the Section 3553(a) factors, he argued that the Government's argument that Hakime "knew or should have known that Brown and Mahrer intended to use the firearm for an act of mass violence" was "a clear breach of its promise not to suggest that the Court consider an adjustment under the Guidelines." (A. 215). In its reply, the Government argued that it was "well within its right to advocate for an upward variance based on several Section 3553(a) factors, including, as outlined in the Government's sentencing submission, the nature and circumstances of the offense; the defendant's history and characteristics; and the need for specific and general deterrence." (A. 240). The Government also made clear that even if the District Court did not find that Hakime knew, or should have known, of Brown and Mahrer's intent, the District Court should still impose a sentence of five years' imprisonment based on the Section 3553(a) factors, among them "the seriousness of the defendant's conduct, including his willingness to provide firearms to two young men and to a convicted felon; his history and characteristics, including his criminal record and his professional background as a long-standing employee of [the Administration for Children Services]; and the need to provide just punishment, to deter the defendant from future crimes, and to protect the public from any such future crimes, particularly in light of the defendant's attempts to conceal his criminal activity and lack of remorse." (A. 244).

12

### C. The Sentencing Proceeding

On February 6, 2024, the District Court proceeded with sentencing. (*See* Dkt. No. 53). Judge Torres found that Hakime's decision to sell the gun to Mahrer and Brown was "reckless," but that the Government had not proven by a preponderance of the evidence that Hakime knew or should have known that Mahrer and Brown intended to use the Firearm to "commit an act of mass violence." (A. 253-54). Judge Torres then determined that the Guidelines range was 10 to 16 months' imprisonment, based on an offense level of 12 and Criminal History Category I, consistent with the calculations set forth in the Plea Agreement and the Presentence Report. (A. 259). Judge Torres found that there was no departure applicable to the Guidelines range. (A. 271). Judge Torres noted, however, that, "separately, a court may impose" a variance—that is, "a sentence that varies from the guidelines framework without specific reference to the guidelines policy statements." (A. 271).

Judge Torres then turned to the Section 3553(a) factors. In doing so, Judge Torres went through a lengthy recounting of Hakime's background and personal characteristics, as well as the seriousness of the offense. (A. 273-75). Judge Torres determined that "the guidelines range does not adequately reflect the seriousness of the crime and the dangerousness of the weapon that [] Hakime trafficked." (A. 275). Judge Torres continued: "Whether or not [] Hakime knew what Brown and Mahrer intended to do with the firearm, he still chose to sell them a firearm that was modified to be deadlier than a regular gun." (A. 276). That,

13

Judge Torres found, was "reckless." (A. 276). Thus, Judge Torres concluded:

> The calculation of Mr. Hakime's offense level under the sentencing guidelines— although correct—does not account for the specific characteristics of the firearm. No enhancements were part of the calculation, as the firearm's characteristics are not covered by the guidelines' enumerated enhancements. The Court, therefore, finds that an upward variance is warranted to reflect both the dangerousness of the firearm and the recklessness of the sale.

(A. 276).

Judge Torres explained that in "deciding to impose an upward variance, the [District] Court is also guided by case law from across the country," which "provides ample support for a district court's discretion to consider a myriad of factors when imposing sentence, including the characteristics of a firearm and a defendant's recklessness." (A. 278). Judge Torres emphasized that "Hakime's reckless sale of the enhanced firearm brings the instant case outside the heartland of the usual gun trafficking cases," which "[t]ypically . . . do not involve enhanced weapons," and ultimately determined that "an upward variance is both reasonable and supported by law based on the dangerousness of the weapons sold by Mr. Hakime and his recklessness in selling it, that is, his 'insufficient concern with the

14

risk' of trafficking the enhanced firearm." (A. 279-80).[4]
Accordingly, Judge Torres sentenced Hakime to 27
months' imprisonment, to be followed by three years'
supervised release. (A. 280).

_____

[4]    In determining Hakime's sentence, the District
Court also assessed the "Sentencing Commission's
treatment of other characteristics that account for a
weapon['s] dangerousness" as "guidance" in "imposing
an upward variance." (A. 277). Judge Torres noted
that under other provisions of the Guidelines, "a de-
fendant's offense level is increased by two levels if the
firearm was stolen" or by four levels "if the firearm had
an altered or obliterated serial number," and then ob-
served that, in this case, a two-level enhancement
"would result in a guidelines range of 15 to 21 months;
and a four-level enhancement would result in a guide-
lines range . . . of 21 to 27 months." (A. 277). Judge
Torres explained that she was not citing those figures
"as part of any mathematical or formulaic approach to
the balancing of the various Section 3553(a) factors,"
but rather "for their persuasive implications." (A. 277).
Judge Torres also explained that she was "guided by
the [C]ommission's treatment of reckless conduct,"
noting that certain provisions in the Guidelines im-
pose a two-level increase for offenses involving reck-
less risk of death or serious bodily injury. (A. 277-78).

15

# A R G U M E N T

## The Government Did Not Breach the Plea Agreement

On appeal, Hakime contends that the Government breached the Plea Agreement by arguing that Hakime "knew or should have known, that Brown and Mahrer intended to engage in an act of mass violence with the gun he sold them." (Br. 28). Specifically, Hakime argues that if the District Court had found that to be the case, it would have been "required to impose a four-level enhancement" under United States Guidelines Section 2K2.1(b)(6)(B). (Br. 23). Hakime therefore argues that the Government violated the terms of the Plea Agreement and that his sentence should be vacated, and the case remanded to a different judge for resentencing. (Br. 24). Hakime's claim is meritless. The Government did not advocate for a sentencing enhancement or a higher Guidelines range at any point in this case. Rather, consistent with the Plea Agreement, the Government argued that the statutory maximum term of imprisonment was the appropriate sentence based on the factors set forth in 18 U.S.C. § 3553(a), which included not only Hakime's knowledge of Brown and Mahrer's plans, but also the seriousness of the offense and the history and characteristics of the defendant.

## A.  Applicable Law

This Court "review[s] plea agreements *de novo* and in accordance with principles of contract law." *United States v. Brumer*, 528 F.3d 157, 158 (2d Cir. 2008) (per curium). "To determine whether a plea agreement has

16

been breached, [it] look[s] to the reasonable understanding of the parties as to the terms of the agreement." *Id*. In light of the Government's "advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002). A defendant who enters into a plea agreement is generally bound by the agreement's terms. *See In re Altro*, 180 F.3d 372, 376 (2d Cir. 1999) (noting that "a defendant may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach.")

"To determine whether a plea agreement has been breached, a court must look to what the parties reasonably understood to be the terms of the agreement." *United States v. Vaval*, 404 F.3d 144, 152 (2d Cir. 2005). "Given the government's often decisive role in the sentencing context, [the Court] will not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness." *United States v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999). In evaluating whether the Government has breached a plea agreement, the particular circumstances of each case "must be carefully studied in context" to determine whether the Government sought "to influence the [district] court in a manner incompatible with the agreement." *United States v. Amico*, 416 F.3d 163, 167 n.2 (2d Cir. 2005).

As a general matter, "[w]hen the Government breaches a plea agreement, the defendant is entitled to either withdraw his plea or have his agreement specifically performed." *Brumer*, 528 F.3d at 158 (quoting

17

*United States v. Cimino*, 381 F.3d 124, 127 (2d Cir. 2004)). This Court, however, has recognized an exception to the need for a remedy for a plea agreement breach by the Government for so-called *de minimis* breaches that occur when "the violation is so minor that it does not cause the defendant to suffer any meaningful detriment." *Vaval*, 404 F.3d at 155. The *de minimis* breach exception applies when the breach causes no real harm "because the defendant's reasonable expectations were fulfilled." *Amico*, 416 F.3d at 167 (quoting *Vaval*, 404 F.3d at 155).

Where the plea agreement contains language in which the parties "expressly agreed that either party could 'seek a sentence outside of the Stipulated Guidelines Range based upon the factors' delineated in 18 U.S.C. § 3553(a)," there is "no error . . . in allowing the government to advocate a sentence above the Stipulated Guidelines Range." *United States v. Sealed Defendant One*, 49 F.4th 690, 696 (2d Cir. 2022); *accord United States v. Parrish*, 755 F. App'x 59, 63 (2d Cir. 2018) (Government did not breach plea agreement by seeking upward variance "based on the factors set forth in 18 U.S.C. § 3553(a), as it had the right to do under the plea agreement and which the defendant's conduct well-supported"); *United States v. Martin*, No. 20-3673, 2022 WL 701712, at *2 (2d Cir. Mar. 9, 2022) (summary order) (same). An argument by the Government "that the Guidelines as applied in this case understated the seriousness of the offense likewise falls within the purview of permissible conduct under [such a] plea agreement." *United States v. Tokhtakhounov*, 607 F. App'x 8, 12 (2d Cir. 2015).

18

## B. Discussion

Hakime argues that the Government breached the Plea Agreement when it advocated for an upward variance based, in part, on the fact that Hakime knew, or should have known, of Brown and Mahrer's intent to use the Firearm for an act of mass violence. (Br. 23). His argument is meritless. The Plea Agreement's explicit terms permitted the Government to seek an above-Guidelines sentence. Consistent with those terms and with the parties' reasonable understanding of it, the Government properly advocated for an above-Guidelines sentence pursuant to the Section 3553(a) factors and did not advocate or suggest that the District Court adopt a Guidelines range different from the Stipulated Guidelines Range.

As is standard and customary in plea agreements offered by the U.S. Attorney's Office for the Southern District of New York, under the express terms of the Plea Agreement here, "either party may seek a sentence outside of the Stipulated Guidelines range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a)." (A. 66). The Government thus expressly reserved its right to advocate for an upward variance based on the Section 3553(a) factors. This Court has repeatedly recognized that this standard and customary language unambiguously gives the Government the right to seek an above-Guidelines sentence under Section 3553(a). *See Sealed Defendant One*, 49 F.4th at 696 (where parties to plea agreement "*expressly* agreed that either party could 'seek a sentence outside of the Stipulated Guidelines Range based upon the [Section

19

3553(a)] factors,'" there is "no error, much less plain error, in allowing the government to advocate a sentence above the Stipulated Guidelines Range" (emphasis in original)); *Martin*, 2022 WL 701712, at *2 (concluding that the Government did not breach its plea agreement by requesting an upward sentencing variance based on the Section 3553(a) factors where the plea agreement permitted the parties to seek an upward variance on that basis); *Parrish*, 755 F. App'x at 62-63 (same); *Tokhtakhounov*, 607 F. App'x at 11-12 (same).

The Government abided by its rights and by its promises to Hakime in the Plea Agreement by permissibly arguing for an above-Guidelines sentence based on the Section 3553(a) factors. (*See* A. 109 ("In this case, an above-Guidelines sentence of five years' imprisonment—the statutory maximum sentence—is the only sentence sufficient to adequately account for the factors set forth in 18 U.S.C. § 3553(a)."); A. 204 ("[A]n above-Guidelines sentence of five years' imprisonment —the statutory maximum sentence—is the only sentence sufficient to adequately account for the factors set forth in 18 U.S.C. § 3553(a).")). In support of its position, the Government argued that the seriousness of the offense and the history and characteristics of the defendant warranted a statutory maximum sentence. In this regard, the Government argued that Hakime's "conduct should be understood in the context of Brown and Mahrer's heinous plot" (A. 109), and that he knew, or should have known, that Brown and Mahrer intended to use the Firearm to "inflict mass harm." (A. 204). The Government therefore appropriately argued that Hakime's knowledge about the potential use

20

of the Firearm was relevant to the Section 3553(a) factors as it was an argument that the Guidelines alone understated the seriousness of the offense. *Tokhtakhounov*, 607 F. App'x at 12.

Moreover, this argument was part and parcel of the Government's overall argument for an upwards variance under the Section 3553(a) factors. As reflected in the Government's submissions (A. 109-112, 204-211, 240-245), the Government consistently argued that a variety of Section 3553(a) factors warranted an above-Guidelines sentence. The Government explained: "[t]hose factors include the seriousness of the defendant's conduct, including his willingness to provide firearms to two young men and to a convicted felon; his history and characteristics, including his criminal record and his professional background as a long-standing employee of ACS; and the need to provide just punishment, to deter the defendant from future crimes, and to protect the public from any such future crimes, particularly in light of the defendant's attempts to conceal his criminal activity and lack of remorse." (A. 244). All of these arguments were consistent with the Plea Agreement, which expressly allowed the Government to argue for an above-Guidelines sentence under Section 3553(a), and consistent with this Court's repeated recognition of the Government's right to do so. *Sealed Defendant One*, 49 F.4th at 696. Indeed, the Government argued that even if the District Court did *not* find that Hakime knew or should have known what Brown and Mahrer intended to do with the Firearm, the same five-year sentence was warranted based on these additional Section 3553(a) arguments. (A. 244).

21

Nothing about these circumstances "raise doubts [about] whether the defendant could reasonably be seen to have understood the risks of the agreement." *United States v. Habbas*, 527 F.3d 266, 271 (2d Cir. 2008). Hakime understood the terms of the Plea Agreement and that his sentence could be higher than the Stipulated Guidelines Range. At the plea colloquy, Hakime confirmed, under oath, that he had read the Plea Agreement, discussed it with his counsel, and understood its terms, including that the parties "may seek a sentence outside th[e] [guidelines] range" set forth therein, and that the maximum penalties he faced on Count One included a term of imprisonment of up to five years." (Plea Tr. at 5, 11, 13-14, 17). Hakime himself took advantage of this provision by seeking a below-Guidelines sentence. There is "no persuasive explanation of how the plea agreement could be breached by conduct it expressly permitted." *Sealed Defendant One*, 49 F.4th at 696.

Hakime contends that the Government's Section 3553(a) argument that he "knew, or should have known, that Brown and Mahrer intended to engage in an act of mass violence," was "tantamount to asking the court to impose the four-level enhancement in § 2K2.1(b)(6)(B), which applies when a defendant transfers a gun with "knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." (Br. 28). That argument proves too much. The same facts may support both a variance under the Section 3553(a) factors and an adjustment under the Guidelines. But this Court has recognized that where the Government argues for a variance based on those facts and does not in any

22

way suggest that the District Court deviate from the stipulated Guidelines range, that advocacy is consistent with the plea agreement and the parties' understandings. *See, e.g.*, *United States v. Rivera*, No. 22-2081, -- F.4th --, 2024 WL 3882099, at *7-8 (2d Cir. Aug. 21, 2024) (sentencing arguments regarding the defendants' "leadership role in the conspiracy" were "relevant to the district court's application" of the Section 3553(a) factors even absent a leadership Guidelines enhancement); *accord Tokhtakhounov*, 607 F. App'x at 11-12 (same).

Hakime's reliance on this Court's decision in *Vaval* fails. In *Vaval*, the Court found that the Government breached a plea agreement by stating, in contravention of the terms of the plea agreement, that but for the agreement, the Government "could make an upward departure" argument, and then "adding arguments that would support such a departure." 404 F.3d at 154. There, the relevant language in the plea agreement prohibited the Government "from seeking an upward departure or taking a position on the appropriate sentence within the applicable Guidelines range." *Id.* at 153.

This case is not *Vaval*. The Government never suggested that the District Court could find an upward departure applied or that the District Court should calculate the offense level differently from the Stipulated Guidelines Range. Nor did the Plea Agreement here prohibit the Government from "taking a position on the appropriate sentence within the applicable Guidelines range." *Id.* The opposite: the Plea Agreement expressly permitted the Government to argue

23

not only within the Stipulated Guidelines Range, but also outside it by seeking an upward variance. *See United States v. Wilson*, 920 F.3d 155, 165 (2d Cir. 2019) (finding breach where plea agreement "lacked any language . . . explicitly reserving the right of the Government to argue for a sentence beyond that called for by the Guidelines"). And while Hakime faults the Government for "declin[ing] to disavow the enhancement's applicability when given the chance to do so" in its submission (Br. 30), the Plea Agreement required no such affirmative representation by the Government. Nor did the Government advocate at sentencing for the applicability of that enhancement. (*Cf.* A. 67 ("In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.")); *accord Tokhtakhounov*, 607 F. App'x at 10 (finding no breach where Government "responded to the district court at sentencing that [an] enhancement could be properly applied").

As the Government's arguments were squarely preserved by the parties' understandings as memorialized in the written Plea Agreement, Hakime instead argues that he "had every reason to believe that the Government would not argue to the sentencing court that he did, in fact, know of the buyer's murderous intent" and that the Government's sentencing arguments amounted to a "dramatic shift" in its position that upset the parties' bargain. (Br. 29). That is factually

24

wrong. The Government argued as early as Hakime's detention hearing that "he posed a danger to the community," because he had "provid[ed] a gun and a firearm to two individuals [ ] one of whom had posted earlier that day what his intention was to do with a gun." (A. 38-39). And Hakime's argument is legally meritless: he "may not rely on a purported implicit understanding in order to demonstrate that the Government is in breach," particularly where, as here, "the Government incorporates into the plea agreement an integration clause expressly disavowing the existence of any understandings other than those set forth in the plea agreement." *Altro*, 180 F.3d at 376; *see also id.* (A "unilateral understanding [is] insufficient to supplement the terms of the written plea agreement."); *United States v. Lenoci*, 377 F.3d 246, 258 (2d Cir. 2004) (same). Under both its written terms and the parties' reasonable expectations, the Government did not breach the Plea Agreement.

Finally, even if there were any technical breach of the Plea Agreement, which there was not, that breach would have been *de minimis*. The Plea Agreement expressly authorized the Government to seek an above-Guidelines sentence based on the Section 3553(a) factors. It is of course not uncommon for the full set of facts relevant to a District Court's Section 3553(a) analysis to intersect with potential Guidelines enhancements that are outside the parties' plea agreements. *See Rivera*, 2024 WL 3882099, at *7-8; *Tokhtakhounov*, 607 F. App'x at 11-12. Where, like here, the Government's argument for an upward variance was based on the totality of the Section 3553(a) factors, any technical breach in implicitly "suggesting" the District

25

Court adopt a different Guidelines calculation when permissibly arguing for a variance caused Hakime no harm "because the defendant's reasonable expectations were fulfilled." *Amico*, 416 F.3d at 167. Moreover, where, as here, Hakime argued for a below-Guidelines sentence, Hakime opened the door to arguments by the Government that a more significant incarceratory sentence was warranted. *See, e.g.*, *United States v. Sehgal*, 480 F. App'x 16, 22 (2d Cir. 2012) (no breach where the Government's comments "were in response to [defendant's] request for a non-Guidelines sentence"); *Amico*, 416 F.3d at 165-66 (no breach where defendant "opened the door" to the Government's response); *see also United States v. Moschella*, 727 F.3d 888, 892 (9th Cir. 2013) (no breach where "the prosecutor's sentencing arguments were a fair response to Defendant's request for a downward variance"); *United States v. Howard*, 299 F. App'x 885, 887 (11th Cir. 2008) (no breach where the Government's statements were "made only in response to [defendant's] argument that the district court should vary downward"). The Government's advocacy was consistent with the letter and the spirit of the Plea Agreement.

26

## CONCLUSION

### The judgment of conviction should be affirmed.

Dated:    New York, New York
              August 29, 2024

                       Respectfully submitted,

                       DAMIAN WILLIAMS,
                       *United States Attorney for the*
                       *Southern District of New York,*
                       *Attorney for the United States*
                             *of America.*

SARAH L. KUSHNER,
MITZI STEINER,
MATTHEW R. SHAHABIAN,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 6,024 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: MATTHEW R. SHAHABIAN,
*Assistant United States Attorney*